VASUDHA TALLA (SBN 316219)
vtalla@aclunc.org
MICHELLE (MINJU) CHO (SBN 321939)
mcho@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 621-2493
Fax: (415) 255-8437

JINGNI (JENNY) ZHAO (SBN 284684)
jennyz@advancingjustice-alc.org
GLENN KATON (SBN 281841)
glennk@advancingjustice-alc.org
ASIAN AMERICANS ADVANCING JUSTICE –
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, California 94111
Telephone: (415) 896-1701
Fax: (415) 896-1702

*Additional Counsel Listed On Next Page*

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN BUKLE,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 5:21-cv-1973<br>**COMPLAINT FOR DAMAGES** |

SEAN A. COMMONS (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 W. Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Fax: (213) 896-6600

## INTRODUCTION

1. This case concerns a fundamental right guaranteed to every person in the United States—the freedom from arbitrary arrest and detention devoid of probable cause. Immigration and Customs Enforcement ("ICE"), with the cooperation of state officials, deprived Plaintiff Brian Bukle of his liberty based on unfounded suspicions, stereotypes, and assumptions that he was a noncitizen. In doing so, Defendants showed callous, willful, and reckless indifference to Mr. Bukle's rights, including creating false records, omitting material information from records, violating their own policies, and directing private contractors to arrest and detain Mr. Bukle as if contractors were actual immigration officers. Despite ample opportunities, Defendants failed to take required steps to verify Mr. Bukle's citizenship status, resulting in his wrongful arrest and detention by ICE for over a month. The sad fact is that Mr. Bukle could still be imprisoned by ICE today, or deported from the U.S., but for the intervention of two attorneys, which finally triggered ICE to check its records and release Mr. Bukle.

2. Mr. Bukle, a Black man, has lived in the United States since he was two years old. Despite decades of U.S. citizenship and residence, Mr. Bukle was falsely arrested, detained, and placed in removal proceedings by ICE. He protested his arrest and detention repeatedly, but was ignored, belittled, and humiliated by Defendants. Officers of the California Department of Corrections and Rehabilitation ("CDCR") facilitated his arrest by ICE's private contractors, though contractors lack any authority to effectuate civil immigration arrests.

3. Mr. Bukle seeks monetary relief against the United States to redress the violations of his rights.

## JURISDICTION

4. The Court has subject matter jurisdiction over Mr. Bukle's claims under 28 U.S.C. §§ 1331 and 1346(b).

5. Mr. Bukle has exhausted his administrative remedies prior to filing this suit. On December 8, 2020, Mr. Bukle timely filed an administrative tort claim with the federal government. 28 U.S.C. § 2401(a). The federal government denied the claim by letter dated January 8, 2021 and postmarked for mailing dated January 11, 2021. Mr. Bukle filed a request for reconsideration on April 20, 2021. The federal government denied the request for reconsideration by letter dated June 24, 2021 and postmarked for mailing dated June 25, 2021. This Complaint is filed within six months of the denial of the request for reconsideration and is therefore timely. 28 U.S.C. § 2401(b).

## VENUE

6. Venue is proper in the Central District of California under 28 U.S.C. § 1402(b) because Mr. Bukle resides in Corona, California, which is in the Central District of California.

## PARTIES

7. Plaintiff Brian Bukle is a United States citizen, and at all times relevant to the allegations in this Complaint was a U.S. citizen. He resides in Corona, California.

8. Defendant United States of America is the proper defendant for claims brought by Mr. Bukle under the Federal Tort Claims Act. 28 U.S.C. § 1346(b). Immigration and Customs Enforcement, a subcomponent of the Department of Homeland Security, was at all relevant times a federal agency, organized and existing under the laws of the United States. The United States is sued for the wrongful acts and omissions of ICE employees while acting within the scope of their employment and has waived its sovereign immunity for such claims.

## FACTUAL ALLEGATIONS

9. Plaintiff Brian Bukle is 62 years old. He has been a U.S. citizen for over 50 years, has lived in the U.S. for decades, and has lived in California since the late 1990s. He has a U.S. citizen child who is a minor.

10. Mr. Bukle entered the United States in 1961 as a lawful permanent resident at the age of two.

11. Mr. Bukle derived citizenship when both his mother and father naturalized to become U.S. citizens. Mr. Bukle has been a U.S. citizen since March 22, 1968, when he was nine years old.

12. A U.S. citizen parent transmits derivative citizenship to their noncitizen child automatically by operation of law once the necessary conditions are fulfilled—here, Mr. Bukle's residence in the United States as a lawful permanent resident and his parents' subsequent naturalization when he was a minor. A person who derives citizenship does not need to file any paperwork with the federal government to become a citizen, nor are they required to obtain or carry any documentation of their citizenship.

13. The U.S. government has officially recognized Mr. Bukle's siblings as also deriving citizenship on March 22, 1968, as a result of their parents' naturalization, on numerous occasions. Decades ago, the government issued Mr. Bukle's twin brother a certificate of citizenship and then a U.S. passport, which it has renewed multiple times. The government also issued Mr. Bukle's older sister, born in April 1954, a certificate of citizenship on October 13, 2006, recognizing that she too became a U.S. citizen on March 22, 1968. The government also issued Mr. Bukle's younger brother, born in July 1961, a certificate of citizenship on November 15, 1983, recognizing that he too became a U.S. citizen on March 22, 1968. On information and belief, Mr. Bukle's siblings' applications for certificates of citizenship identified Mr. Bukle's mother and father as the naturalized U.S. citizens through whom they obtained U.S. citizenship.

14. Mr. Bukle has worked in several occupations, including as a forklift and heavy equipment driver, in construction, and as a school custodian. Since he was a young man, Mr. Bukle has held state-issued driver's licenses, including in

Alaska and while he has lived in California. Mr. Bukle also has had a social security number for decades.

15. In the 1990s, an officer with the Immigration and Naturalization Service ("INS") interviewed Mr. Bukle to determine whether he was deportable. That officer instead concluded he was a U.S. citizen and took no enforcement action against him. The records of the INS officer's encounter with Mr. Bukle and the officer's conclusion that Mr. Bukle was a citizen were available to the ICE immigration officers who arrested and detained him.

**A. CDCR's Initiation and Acceptance of an ICE Detainer for Mr. Bukle, a U.S. Citizen**

16. In July 2018, Mr. Bukle entered CDCR custody. While in custody, Mr. Bukle informed CDCR officers on multiple occasions that he is a U.S. citizen. CDCR employees recorded Mr. Bukle's assertion of U.S. citizenship in their files in multiple places.

17. On information and belief, CDCR employees provided ICE with a list of foreign-born individuals in CDCR custody, including Mr. Bukle. On information and belief, CDCR employees identified Mr. Bukle as a "potential ICE hold," based solely on the fact of Mr. Bukle's birth outside of the United States.

18. On March 28, 2019, Jaime Maldonado, an ICE immigration officer issued a detainer request on Department of Homeland Security ("DHS") Form I-247A to CDCR for Mr. Bukle requesting that CDCR maintain custody of Mr. Bukle for up to 48 hours after he would otherwise be eligible for release. The detainer form asserted that ICE had probable cause for Mr. Bukle's arrest based only upon a purported "biometric confirmation of [Mr. Bukle's] identity and a records check of federal databases . . . " indicating that he was removable from the United States.

19. As described further below, the biometrics-based check of federal databases was insufficient to generate probable cause of Mr. Bukle's removability from the United States.

20. Despite Mr. Bukle's repeated statements to CDCR employees that he was a citizen, those employees' documentation of his citizenship in CDCR records, and other information readily available to CDCR, CDCR employees accepted the immigration detainer from ICE and placed an "active ICE hold" on Mr. Bukle.

21. When Mr. Bukle learned about the immigration detainer, he was distraught that he might be wrongfully imprisoned and deported after he completed his CDCR sentence. Upon learning of the detainer, he repeatedly told CDCR officers and employees that he was a U.S. citizen.

22. Despite Mr. Bukle's continued claims that he was a U.S. citizen, CDCR officers refused to lift the ICE hold. A captain at the prison disclaimed any responsibility for the ICE hold by telling Mr. Bukle that because ICE "wanted" him, the prison would send him to ICE.

23. As Mr. Bukle approached his release date in June 2020, he began preparing for his family members to pick him up. He was excited to reunite with his son on Father's Day.

24. On June 16, 2020, a CDCR employee informed Mr. Bukle that instead of being released, he would be picked up by ICE the next day. Mr. Bukle again stated that he was a U.S. citizen but was again disregarded by the CDCR employee.

**B. Mr. Bukle's Transfer from CDCR to ICE Custody on June 17, 2020**

25. On the morning of June 17, 2020, CDCR officers took Mr. Bukle from his housing area at CCI Tehachapi, made him remove his clothes, searched him, and placed shackles on him as he was being moved through the facility.

26. Mr. Bukle told the CDCR officers that he was a U.S. citizen and asked why he was being transferred to ICE. The CDCR officers responded, "ICE wants you." When Mr. Bukle insisted that the CDCR officers were making a mistake in

transferring him to ICE, they said to him, “You’re not a citizen. You’re a foreigner.”

27. The CDCR officers placed Mr. Bukle in a holding cell in a processing area along with another man being transferred to ICE that day.

28. While Mr. Bukle remained in the holding cell, he witnessed several other individuals being released from CDCR custody. The CDCR officers, however, assisted in and enabled Mr. Bukle’s arrest by preventing Mr. Bukle from leaving—for the sole purpose of affording ICE additional time to arrive at the facility and take custody of Mr. Bukle.

29. A few hours after Mr. Bukle was placed in the holding cell, two individuals employed by G4S Secure Solutions, Inc. (“G4S”), both wearing grey uniforms, arrived and entered the processing area. The two G4S employees were not accompanied by any immigration officers employed by ICE or DHS, yet, on information and belief, were directed and sent by ICE to take custody of Mr. Bukle.

30. Even though the G4S employees were not ICE officers, and lack any lawful authority to arrest citizens or noncitizens, the CDCR officers permitted the G4S employees to enter the holding cell where Mr. Bukle was detained in a secure area of the prison to take him into custody. G4S employees placed shackles on Mr. Bukle.

31. One G4S employee who arrested Mr. Bukle who facilitated the unlawful arrest intimidated and harassed Mr. Bukle during the arrest. He taunted Mr. Bukle that ICE would put him on a plane to be deported. The G4S employee gave approximately two pennies to the other man who was being transferred from CDCR to ICE custody that day, then pointed to Mr. Bukle, and said to him, “You get nothing!” When Mr. Bukle asked what would happen to the money he worked for his entire life, the G4S employee replied, “ICE takes all of that from you. When you come here illegally that’s what you get.”

32. At the time ICE directed G4S employees to arrest Mr. Bukle at the CDCR facility, ICE did not possess probable cause of Mr. Bukle's removability.

**C. ICE Officers Detained Mr. Bukle at the Field Office and Falsified Evidence Against Mr. Bukle**

33. Mr. Bukle was taken by the two G4S employees to the ICE sub-field office in Bakersfield, California (the "Field Office"), where he was placed in a holding cell.

34. One or more ICE immigration officers with ICE Enforcement and Removal Operations ("ERO") spoke with and/or prepared documents in connection with Mr. Bukle's arrest and processing at the ICE Field Office on June 17, 2020. This group of ICE immigration officers will be referred to collectively as the "ICE ERO Officers."

35. An ICE immigration officer spoke with Mr. Bukle at the ICE Field Office. This ICE officer was wearing office clothes (slacks and a shirt), had black hair, and appeared to be in his 30s or 40s. On information and belief, this ICE immigration officer was Deportation Officer R. Cruz.

36. Mr. Bukle repeatedly told the ICE immigration officer that he was a U.S. citizen and that both his mother and his father had naturalized as U.S. citizens when he was a child.

37. The ICE immigration officer told Mr. Bukle that he had checked databases, but only found evidence of Mr. Bukle's father's U.S. citizenship, and had not found evidence of his mother's U.S. citizenship. The immigration officer told Mr. Bukle, "We're going to send you back."

38. Mr. Bukle asked the ICE immigration officer to call Mr. Bukle's brother, Basil Bukle, who could corroborate Mr. Bukle's citizenship. The immigration officer took the phone number of Basil, entered it into a telephone, and told Mr. Bukle to take the phone. Basil answered the phone call and repeatedly

confirmed to Mr. Bukle that he was a U.S. citizen. Basil asked to speak to the ICE immigration officer to convey that Mr. Bukle was a U.S. citizen.

39. Mr. Bukle asked the ICE immigration officer to speak to Basil so that Basil could confirm that he was a U.S. citizen. The ICE immigration officer refused to speak with Basil. Throughout Mr. Bukle's telephone call with Basil, the ICE immigration officer stood only a few feet away from Mr. Bukle.

40. After the phone call ended, Basil called the phone number back. An ICE immigration officer picked up the phone but refused to speak to Basil about Mr. Bukle's citizenship status.

41. The ICE immigration officer stated that because Mr. Bukle had committed a crime, he would be deported. The ICE immigration officer told Mr. Bukle, "They want you out, they don't want you here." He urged Mr. Bukle to sign papers to go back to his country.

42. The ICE immigration officer took Mr. Bukle back to a holding cell at the ICE Field Office. The ICE immigration officer told him that he would have to contact a lawyer to represent him in immigration court.

43. ICE ERO Officers did not possess probable cause to detain Mr. Bukle. Mr. Bukle repeatedly told the ICE ERO Officers that he was a U.S. citizen. ICE ERO Officers were aware that Mr. Bukle's father, at a minimum, had naturalized when Mr. Bukle was a minor, and that Mr. Bukle was a lawful permanent resident at the time of his father's naturalization. Mr. Bukle's brother was on the telephone and confirmed that Mr. Bukle was a U.S. citizen. Mr. Bukle repeatedly told ICE ERO Officers that his mother had also naturalized when he was a minor. ICE was aware that these pieces of information were evidence of derivative citizenship. ICE also had access to multiple records that confirmed and, at a minimum, corroborated Mr. Bukle's U.S. citizenship.

44. The ICE ERO Officers did not take the actions required by ICE Policy No. 16001.2, entitled "Investigating the Potential U.S. Citizenship of Individuals

Encountered by ICE" (the "Directive"). The Directive was in effect at all times relevant to the allegations in this Complaint.

45. The Directive recognizes that, "[a]s a matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a U.S. citizen." The Directive establishes "ICE policy to carefully and expeditiously investigate and analyze the potential U.S. citizenship of individuals encountered by ICE." The Directive imposes mandatory obligations upon ICE immigration officers if (a) the individual makes or has made a claim to U.S. citizenship; and/or (b) if certain indicia of potential U.S. citizenship, as set forth in the Directive, are present even if the individual does not affirmatively make a claim to U.S. citizenship.[1]

46. The Directive applied to the ICE ERO Officers who encountered Mr. Bukle at the ICE Field Office on June 17, 2020 because Mr. Bukle made an affirmative claim to U.S. citizenship and indicia of his U.S. citizenship existed. The indicia of Mr. Bukle's citizenship that existed included, at a minimum: (1) his father's naturalization when Mr. Bukle was a minor; (2) Mr. Bukle's admission to the United States as a lawful permanent resident as a two-year-old; (3) the issuance of certificates of citizenship and U.S. passports to several of Mr. Bukle's siblings, including a twin brother sharing Mr. Bukle's date of birth, an older sibling, and a younger sibling; and (4) Mr. Bukle's brother's availability by telephone to confirm Mr. Bukle's citizenship.

[1] The Directive sets forth the following factors, among others, as indicia of potential U.S. citizenship: (a) A legal representative or purported family member indicates to ICE that the individual is or may be a U.S. citizen; (b) there is some information suggesting that one or more of the individual's parents, grandparents, or foreign-born siblings are or were U.S. citizens; (c) the individual entered the United States as a lawful permanent resident when he or she was a minor and has at least one parent who is a U.S. citizen. If any of these factors are present, ICE officers must engage in further investigation of the individual's U.S. citizenship. All of these factors were present when the ICE immigration officer spoke to Mr. Bukle at the ICE Field Office on June 17, 2020.

47. The ICE ERO Officers did not take a sworn statement from Mr. Bukle about his citizenship, as required by the Directive.

48. The ICE ERO Officers did not interview Mr. Bukle's brother on the telephone about Mr. Bukle's claim to citizenship, as required by the Directive. Instead, the ICE ERO Officers refused to speak to Mr. Bukle's brother.

49. The ICE ERO Officers did not prepare a memorandum assessing Mr. Bukle's claim of citizenship, as required by the Directive.

50. The ICE ERO Officers did not notify ICE's Office of Chief Counsel ("OCC") of Mr. Bukle's claim of citizenship, as required by the Directive.

51. Instead, ICE immigration officers R. Cruz, E. Garibay and/or D. Lowes prepared a Form I-213, Record of Deportable/Admissible Alien, dated June 17, 2020. The Form I-213 bears the printed name and printed signature of Officer E. Garibay, and states that the examining officer was Officer D. Lowes. The Form I-213 states that Mr. Bukle was interviewed by Officer Cruz.

52. In the Form I-213, Officers Cruz, Garibay and/or Lowes inserted false information or omitted required information.

a. Officers Cruz, Garibay and/or Lowes falsely stated on the I-213 that Mr. Bukle stated he was a citizen of the British Virgin Islands;

b. Officers Cruz, Garibay, and/or Lowes omitted from the I-213 that Mr. Bukle had told them he was a U.S. citizen—something these officers could have confirmed through interviews with Mr. Bukle and his siblings, and with records accessible to ICE;

c. Officers Cruz, Garibay and/or Lowes falsely stated on the I-213 that Mr. Bukle denied being a U.S. citizen;

d. Officers Cruz, Garibay, and/or Lowes omitted from the I-213 that Mr. Bukle had told them his mother had naturalized and was a U.S. citizen; and

e. Officers Cruz, Garibay and/or Lowes falsely stated on the I-213 that Mr. Bukle claimed that his mother was a lawful permanent resident. Mr. Bukle made no such statement.

53. The ICE immigration officers further violated the Directive by issuing an administrative arrest warrant for Mr. Bukle on June 17, 2020, signed by Officer Lowes and served by Officer Cruz. The Directive prohibits the arrest of an individual where probative evidence of U.S. citizenship exists.

54. On June 17, 2020, Officer Lowes issued a Notice to Appear charging Mr. Bukle with being a citizen of the British Virgin Islands and being removable from the United States. The Notice to Appear was eventually filed with the immigration court, with the I-213 prepared by Officers Cruz, Garibay and/or Lowes as supporting evidence, commencing removal proceedings.

55. On June 17, 2020, Officer Lowes issued a Form I-286 Notice of Custody Determination, informing Mr. Bukle that he would be detained by ICE pending a decision in his removal proceedings. The contents of the Form I-286 were read to Mr. Bukle by Officer Cruz. The ICE immigration officers' decision to detain Mr. Bukle pending removal proceedings violated the Directive, which requires immediate release where there is probative evidence of U.S. citizenship.

**D. Mr. Bukle Was Subjected To Unlawful Detention and Removal Proceedings**

56. On June 17, 2020, Mr. Bukle was taken from the ICE Field Office to the Mesa Verde Detention Facility, an ICE detention facility operated by the GEO Group—essentially an immigration jail. Shortly after he arrived, Mr. Bukle spoke with a purported therapist and again asserted that he was a U.S. citizen. She told him that he would have to speak to an immigration officer about his claim. The therapist also urged Mr. Bukle to sign paperwork to agree to deportation. She claimed that, if Mr. Bukle agreed to deportation, he would be able to see his son.

57. While he was detained, Mr. Bukle repeatedly asked various guards at the immigration jail to speak with an immigration officer. They all told him that he needed to wait until an immigration officer arrived at the facility.

58. While he was detained, Mr. Bukle repeatedly told various guards and other individuals working at the immigration jail that he was a U.S. citizen. None of the individuals who heard Mr. Bukle's claim of citizenship took any actions to secure Mr. Bukle's release from detention or otherwise investigate his claim.

59. On June 30, 2020, Mr. Bukle appeared by videoconference at the North Los Angeles Immigration Court in front of Immigration Judge ("IJ") Aina. Mr. Bukle asked for more time to find an attorney, which IJ Aina granted. IJ Aina did not read any allegations from the Notice to Appear, nor did he take pleadings from Mr. Bukle. Mr. Bukle did not concede alienage or deportability.

60. On July 14, 2020, Maddie Boyd, an immigration attorney from the San Francisco Public Defender's Office, sent a fax to ICE immigration officers stating that Mr. Bukle derived citizenship from his parents at the time of their naturalization. Ms. Boyd requested that the immigration officers check the naturalization status of Mr. Bukle's parents.

61. On July 21, 2020, Susan Beaty, an immigration attorney from Centro Legal de la Raza, communicated with the North Los Angeles Immigration Court, ICE ERO, and ICE's Office of Chief Counsel to notify ICE and its immigration officers once more of Mr. Bukle's U.S. citizenship. In these communications, Beaty requested an investigation pursuant to the Directive. Beaty also enclosed Mr. Bukle's father's naturalization certificate and his siblings' certificates of citizenship—records and information that had always been accessible to ICE.

62. In response to Beaty's communications, ICE's Office of Chief Counsel ("OCC") performed an electronic search that readily located a United States passport number for Mr. Bukle's mother. On information and belief, the ICE ERO

Officers had access to the same sources of information as OCC, including but not limited to CCD (a State Department database of U.S. passport holders).

63. Had the ICE ERO Officers followed the Directive, at the very least, they would have contacted OCC within one business day of speaking with Mr. Bukle on June 17, 2020, and OCC would have been able to confirm Mr. Bukle's U.S. citizenship at that time, avoiding any further unlawful detention of a U.S. citizen by ICE.

64. On July 22, 2020, Mr. Bukle was taken to an ICE Field Office and released.

65. On July 23, 2020, at a master calendar hearing in immigration court, IJ Aina terminated Mr. Bukle's removal proceedings. In terminating proceedings, IJ Aina relied on an admission during the hearing by an attorney representing ICE that Mr. Bukle was a U.S. citizen and the letter from Beaty stating that Mr. Bukle was a U.S. citizen.

66. Only on July 23, 2020, did the ICE ERO Officers take a sworn statement from Mr. Bukle's brother about their parents' naturalization—even though Mr. Bukle's brother had requested the opportunity to speak with ICE ERO Officers over a month before on June 17, 2020.

**E. Mr. Bukle Suffered and Continues To Suffer From Physical, Mental, and Emotional Pain As A Result of His Unlawful Arrest and Detention By ICE**

67. During Mr. Bukle's 36-day detention at Mesa Verde, an outbreak of COVID-19 in the facility caused dozens of detained people and staff to contract the virus and become seriously ill. He felt deeply anxious and constantly worried for his health, especially because of his advanced age.

68. While detained, Mr. Bukle suffered from food poisoning and diarrhea, forcing him to miss an immigration court date.

69. In addition to concerns about his physical safety, Mr. Bukle suffered immense mental and emotional harm as a result of his unlawful detention. Each day, he contemplated the thought of being permanently separated from his family and deported to a country he did not know. This fear was exacerbated by a therapist and GEO employees at Mesa Verde, all contracted by ICE for purposes of operating the immigration jail, who often urged Mr. Bukle to sign the deportation papers and leave his young son behind in the U.S.

70. Mr. Bukle repeatedly and regularly asserted that he was a U.S. citizen to CDCR officers, G4S employees, ICE officers, and GEO employees for over a year from the time that he was informed that an ICE hold had been placed on him until his final days in ICE detention.

71. Mr. Bukle felt a complete loss of control over his life and the events that were unfolding. He was angry, hurt, and wondered how he could end up at risk of being deported though he was a citizen. He feared the loss of his life in the United States, and felt embarrassed, rejected, disrespected, and disbelieved by everyone around him.

72. The cumulative impact of being wrongfully imprisoned, dismissed, disbelieved, and belittled by ICE and G4S employees has been profound and has continued long after Mr. Bukle's release.

73. Over a year later, Mr. Bukle continues to feel disgusted, severely depressed, and anxious. Mr. Bukle suffers from nightmares about his near-deportation and has difficulty sleeping. He has flashbacks about the days leading up to his arrest and transfer to ICE and his time in immigration jail, in which he remembers the feelings of being disrespected and ignored. He feels confused about why he was arrested even though he is a citizen, and anxious about being arrested or detained by ICE in the future. Mr. Bukle feels that his citizenship can be revoked at any time, creating long periods of depression. He has sought treatment from a professional therapist, whom he visits regularly.

### F. **Biometrics-Based Database Detainers Lack Probable Cause of Removability**

74. ICE relies on close collaboration with CDCR to effectuate arrests of individuals who have served their sentences and are being released from state prisons.

75. To request collaboration, ICE issues immigration detainers using Form I-247A to federal, state, and local law enforcement agencies. An immigration detainer requests that the receiving agency detain individuals up to 48 hours beyond the time they would otherwise be released from custody, in order to allow ICE to take custody.

76. Immigration detainers are forms containing blank lines, blank boxes, and check boxes. They were developed by DHS and are prepared and signed by immigration officers employed by ICE. No judge or neutral official reviews ICE's probable cause determination prior to or any time after the issuance of an immigration detainer.

77. Form I-247A provides, "DHS has determined that probable cause exists that the subject is a removable alien." It lists four possible justifications for this determination, one or more of which an immigration officer must check off: (1) "A final order of removal against the alien;" (2) "The pendency of ongoing removal proceedings against the alien;" (3) "Biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law;" and (4) "Statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicate the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law."

78. Detainers which have only the third box checked are known as "biometrics-based database detainers." When ICE immigration officers issue biometrics-based database detainers, they do not possess probable cause of an individual's removability notwithstanding the text on the detainer asserting the existence of probable cause.

79. The databases ICE uses to issue biometric-based database detainers, and used to issue Mr. Bukle's detainer, are unreliable sources of information about U.S. citizenship and immigration status and cannot support a finding of probable cause on their own.

80. Establishing probable cause that an individual is subject to removal requires ICE to determine, *first*, whether the individual is a U.S. citizen; *second*, if not, what is their current immigration status; and *third*, are they removable because of or in spite of their current status.

81. There are no circumstances where database information alone is reliable enough for probable cause that an individual is *not* a U.S. citizen.

82. The databases on which ICE relies to make probable cause determinations to support biometrics-based database detainers provide static, often outdated information about dynamic facts. A person's immigration status may change multiple times throughout a lifetime. The databases often fail to record a change in a person's immigration status when it occurs. As a result, a person's citizenship or immigration status at some fixed point in the past is *not* a reliable indicator of their current citizenship or immigration status. None of the databases on which ICE depends necessarily reflect a person's immigration status at the time a detainer is, or will be, issued.

83. The databases on which ICE relies lack historical records, frequently contain incomplete data and significant errors, and miss crucial pieces of information necessary for making probable cause determinations. For instance, they frequently lack naturalization data prior to the mid-1990s. Government studies have

demonstrated that the databases on which ICE relies frequently contain misspelled names, incorrect name order, incorrect nationality, incorrect class of admission, and other inaccurate information.

84. On information and belief, at the time that Mr. Bukle's biometrics-based database detainer was issued in March 2019, ICE relied on the following databases when issuing the detainer: CIS, CLAIMS 3, CLAIMS 4. These databases taken together are unreliable sources for probable cause that a person is a non-citizen.

85. There is no database of foreign-born U.S. citizens who derived their U.S. citizenship.

86. ICE's database searches are particularly ill-equipped to identify derivative citizens like Mr. Bukle, *i.e.*, individuals who automatically became citizens by operation of law when one or both parents naturalized.

87. The databases on which ICE relied—CIS, CLAIMS 3, CLAIMS4—almost always wrongly identify derivative citizens as lawful permanent residents.

88. The CIS database, for example, contains a "class of admission" field that purports to report a person's immigration status. As a general matter, the class of admission field has a 30% error rate according to government studies by the DHS Office of the Inspector General and the Government Accountability Office. But the error rate for derivative citizens is significantly higher. CIS never updates the class of admission field when a child derives citizenship, unless the child applied for a certificate of citizenship after 2013 when the databases began to record them. Only a small percentage of derivative citizens ever apply for certificates of citizenship because of the cost and delays associated with the process. As a result, unless an individual obtained a certificate of citizenship after 2013, derivative citizens appear as lawful permanent residents in the CIS database in perpetuity.

89. The CLAIMS 3 database records applications for lawful permanent residence, but does not update when a lawful permanent resident derives citizenship. As a result, CLAIMS 3 never contains accurate information about the citizenship status of derivative citizens.

90. The CLAIMS 4 database contains information about derivative citizens only if they applied for certificates of citizenship after 2013, which most derivative citizens do not. As a result, CLAIMS 4 usually contains no information about derivative citizens.

91. Upon information and belief, ICE issued Mr. Bukle's ICE detainer, arrested Mr. Bukle, and initiated removal proceedings against him based on an incorrect notation in the CIS database reflecting he was a lawful permanent resident, when in fact he became a citizen decades ago.

92. Moreover, none of the databases relied on by ICE contain the citizenship of a person's parents—threshold facts in flagging potential derivative citizenship. The CIS and CLAIMS databases contain only the first names of a person's parents, if they contain the parents' names at all, making it impossible in many cases to determine the parents' citizenship through database searches alone. ICE could not have relied on the absence of naturalization information for Mr. Bukle's mother to conclude that she was not a citizen because CLAIMS contains no information about an individual who naturalized before 2004, and CIS contains only limited historical information before 1985.

93. Generally, derivative citizenship cannot be detected or investigated without an interview.

94. The Department of Homeland Security has acknowledged the unreliability of the CIS database and admonished agencies not to rely on it for probable cause determinations.

95. Errors in and missing information from the databases on which ICE relies have caused the arrests of U.S. citizens and lawfully present noncitizens alike.

96. Multiple other more reliable source of information exist to ascertain an individual's immigration or citizenship status, including by interviewing individuals and their families.

## CLAIMS FOR RELIEF

### COUNT ONE

### Federal Tort Claims Act

### False Arrest/False Imprisonment

97. The foregoing allegations are realleged and incorporated herein.

98. Defendant United States, through the actions and omissions of the ICE ERO Officers described above, inflicted personal injury on Mr. Bukle by subjecting him to false arrest and imprisonment.

99. The ICE ERO Officers intentionally caused Mr. Bukle to be arrested.

100. The ICE ERO Officers lacked lawful privilege to arrest or detain Mr. Bukle because Mr. Bukle is, and was at all relevant times, a U.S. citizen.

101. There was no lawful privilege for Mr. Bukle's arrest at the prison.

102. The ICE ERO Officers did not have legal justification or probable cause to believe Mr. Bukle was a noncitizen subject to removal from the United States when they directed G4S employees to effectuate his arrest.

103. The ICE ERO Officers knowingly relied upon faulty databases when they issued a detainer for Mr. Bukle and subsequently directed G4S to effectuate his arrest on the basis of that detainer. In any event, on information and belief, the ICE ERO officers knew that they could not rely on the databases because the databases fail to identify derivative U.S. citizens as such in the vast majority of cases.

104. Mr. Bukle's arrest upon being released by CDCR lacked lawful privilege because he was arrested by employees of G4S, who are private contrators, not immigration officers.

105. There was no lawful privilege for Mr. Bukle's detention by ICE after Mr. Bukle encountered the ICE ERO Officers at the ICE Field Office. The ICE ERO Officers did not have legal justification or probable cause to believe Mr. Bukle was a noncitizen subject to removal from the United States.

106. Even assuming ICE databases could ever be sufficiently reliable to make a probable cause determination, the ICE ERO Officers did not have legal justification or probable cause to arrest and detain Mr. Bukle after being presented with his claim to citizenship; Mr. Bukle's brother's assertion that Mr. Bukle was a citizen, and substantial and probative evidence of Mr. Bukle's citizenship because of his parents' and siblings' biographical and citizenship information.

107. Mr. Bukle did not freely and voluntarily consent to his imprisonment.

108. Mr. Bukle was confined as a result of the ICE ERO Officers' actions.

109. The ICE ERO Officers' conduct proximately caused Mr. Bukle actual harm.

110. The ICE ERO Officers were, at all times relevant, federal law enforcement officers and employees of ICE and Defendant United States, for whose actions Defendant United States can be held liable. *See* 28 U.S.C. § 2680(h).

**COUNT TWO**

**Federal Tort Claims Act**

**Malicious Prosecution**

111. The foregoing allegations are realleged and incorporated herein.

112. As described above, the ICE ERO Officers prepared and entered false information on Mr. Bukle's Form I-213, omitted material information from Mr. Bukle's Form I-213, were aware that inserting the false information and omitting material information was necessary to create the fiction of probable cause of removability; were aware that the false statements and misleading omissions would prolong Mr. Bukle's unlawful detention and result in him being placed in removal proceedings; were aware that the false statements would serve as the factual and

legal basis of a Notice to Appear initiating removal proceedings against Mr. Bukle. The ICE ERO Officers were actively involved in bringing civil removal proceedings against Mr. Bukle.

113. Mr. Bukle's civil removal proceedings were terminated in his favor.

114. The ICE ERO Officers lacked probable cause to initiate civil removal proceedings against Mr. Bukle, or to arrest and detain him.

115. The ICE ERO Officers acted with malice in initiating civil removal proceedings against Mr. Bukle, including by refusing to speak to his brother, humiliating and belittling Mr. Bukle, falsifying records, omitting material information from records, and refusing to follow the Directive.

116. The ICE ERO Officers' conduct proximately caused Mr. Bukle actual harm.

**COUNT THREE**

**Federal Tort Claims Act**

**Intentional Infliction of Emotional Distress**

117. The foregoing allegations are realleged and incorporated herein.

118. Despite Mr. Bukle's constant assertions and offers of proof that he is a U.S. citizen, Defendant United States, through the ICE ERO Officers, intentionally took him into federal custody and maintained him in federal custody, without probable cause.

119. The ICE ERO Officers denigrated, threatened, and belittled Mr. Bukle as he objected to his treatment.

120. As a result of the ICE ERO Officers' actions, Mr. Bukle was detained for 36 days by ICE. He suffered severe fear and anxiety while in immigration detention because of an outbreak of COVID-19 that infected dozens of people during June and July 2020.

121. These actions, carried out by agents in a relation or position of power with respect to Mr. Bukle, were outrageous.

122. Defendant United States, through the ICE ERO Officers, intended to cause Mr. Bukle's emotional distress, or acted with reckless disregard of the possibility that Mr. Bukle would suffer emotional distress. Defendant's conduct was designed to cause and naturally caused severe emotional distress, including pain, suffering, trauma, worry, anxiety, humiliation, and embarrassment. Mr. Bukle has had and continues to have physical and emotional symptoms as a result of the ICE ERO Officers' conduct.

**COUNT FOUR**

**Federal Tort Claims Act**

**Negligence**

123. The foregoing allegations are realleged and incorporated herein.

124. ICE officials have a duty to act with reasonable care and to not subject individuals to personal injury during the course of their duties.

125. ICE officials have a duty to not subject individuals to unreasonable searches or seizures.

126. Defendant United States, through the ICE ERO Officers, breached one or more of these duties.

127. As set forth above, ICE officials routinely rely on databases that they know and admit to be incomplete to authorize and justify the issuance of detainers and arrests. This causes harm to individuals like Mr. Bukle (including other foreign-born U.S. citizens) by depriving them of their liberty without probable cause to believe they are removable. On information and belief, the ICE ERO Officers' negligent reliance solely on databases known to be flawed caused Mr. Bukle's unlawful detention and resulting injuries.

128. Even assuming ICE databases could ever be sufficiently reliable to make a probable cause determination, the ICE ERO Officers were negligent in relying on the databases because, on information and belief, the databases fail to identify derivative U.S. citizens as such in the vast majority of cases.

129. Even assuming ICE databases could ever be sufficiently reliable to make a probable cause determination, the ICE ERO Officers were negligent because records readily available to ICE affirmatively demonstrated that Mr. Bukle is a U.S. citizen.

130. Even assuming ICE databases could ever be sufficiently reliable to make a probable cause determination, the ICE ERO Officers were negligent in failing to follow the Directive respecting individuals claiming U.S. citizenship.

131. As set forth above, the ICE ERO Officers were negligent in allowing G4S employees, privator contractors, to arrest Mr. Bukle.

132. As set forth above, the ICE ERO Officers were negligent in prolonging Mr. Bukle's detention upon his transfer from CDCR as no reasonable person could believe that probable cause existed.

133. As a result of the ICE ERO Officers' actions and inactions, Mr. Bukle was harmed.

**COUNT FIVE**

**Federal Tort Claims Act**

**The Bane Act (Cal. Civ. Code § 52.1(a))**

134. The foregoing allegations are realleged and incorporated herein.

135. Defendant United States, through the ICE ERO Officers, intentionally caused Mr. Bukle to be detained and detained him acting through G4S employees who lack authority to make civil immigration arrests, and without probable cause to believe he was removable, despite his consistent assertions that he is a U.S. citizen. This unlawful detention was accomplished through coercion, i.e., through Mr. Bukle's forced continuing incarceration. Therefore, Defendant United States, through the ICE ERO Officers, interfered with Mr. Bukle's exercise or enjoyment of his rights secured by the following federal and state laws, including but not limited to:

a. The right to be secure from unreasonable searches and seizures, as secured by the California Constitution, Article 1, Section 13; and

b. The requirement under the INA and implementing regulations that civil immigration arrests be made by federal immigration officers and not by employees of private contractors, *see* 8 U.S.C. §§ 1357(a)(2), (a)(5)(B); 8 C.F.R. §§ 287.5(c)(1), (e)(3); 287.8(b)(3), (c)(1); 8 C.F.R. § 236.1(b)(1); 8 C.F.R. § 1.2 (defining "[i]mmigration officer[s]" as "employees of the Department of Homeland Security").

136. The ICE ERO Officers interfered with the exercise of Mr. Bukle's rights through threat, intimidation, or coercion, including by continuing Mr. Bukle's detention, repeatedly dismissing Mr. Bukle's claims to U.S. citizenship, and threatening to throw Mr. Bukle out of the country.

137. The ICE ERO Officers interfered with the exercise of Mr. Bukle's rights with knowledge and spite or reckless disregard of the unlawfulness of performing immigration arrests based solely on biometrics-based database detainers, and directing private contractors to perform immigration arrests. Therefore, Defendant United States, through the ICE ERO Officers, violated Mr. Bukle's rights under California Civil Code § 52.1.

138. As a direct and proximate result of Defendants' acts as set forth above, Ms. Bukle sustained injuries and damages.

//

//

//

//

//

//

//

//

## PRAYER FOR RELIEF

WHEREFORE, Mr. Bukle respectfully requests that the Court grant the following relief:

a. Award compensatory damages against the United States under the FTCA;

b. Award prejudgment interest on any award of damages to the extent permitted by law;

c. Award reasonable attorneys' fees and costs under applicable law; and

d. Grant such other relief as the Court deems just and proper.

Dated: November 22, 2021

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA

By: *__/s/ Vasudha Talla_______*
VASUDHA TALLA
Attorneys for Plaintiff